**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **Baltimore-D.C. Metro Building and Construction Trades Council,**<br>  5829 Allentown Road<br>  Camp Springs, MD 20746,<br><br>            *Plaintiff,*<br><br>  v.<br><br>**Metropolitan Washington Airports Authority,**<br>  1 Aviation Circle<br>  Washington, D.C. 20001,<br><br>            *Defendant.* | No. 26-cv-296 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      In November 2022, the Metropolitan Washington Airports Authority ("MWAA") passed a resolution requiring project labor agreements ("PLAs") on construction projects worth $35 million or more for which MWAA is eligible to receive discretionary federal funding.  But, MWAA has started to ignore that resolution and issue solicitations without PLA requirements.  In so doing, MWAA is violating its lease with the federal government and causing the Baltimore-D.C. Metro Building and Construction Trades Council ("Baltimore-DC Building Trades") irreparable harm.

2.      PLAs are comprehensive prehire collective bargaining agreements negotiated between building and construction trades unions and project owners, contractors, or construction managers.  The Baltimore-DC Building Trades is currently completing work under a PLA for an MWAA project and anticipated negotiating more PLAs in the future.

3.     Under its lease with the federal government, MWAA is required to follow sound contracting procedures and adhere to its procurement policies and procedures.  Federal district courts have the authority to compel MWAA to comply with the terms of its lease.

4.     This Court should declare that MWAA has violated its lease by refusing to comply with its November 2022 resolution, require MWAA to comply with that resolution, and enjoin MWAA from violating that resolution by awarding contracts without a PLA on large-scale construction projects eligible to receive discretionary federal funding.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction under 28 U.S.C. § 1331 because the claim alleged in this Complaint arises under the Metropolitan Washington Airports Act of 1986 § 6005(e), Pub. L. No. 99-500, 100 Stat. 1783, 1783-378 (codified at 49 U.S.C. § 49104(c)).

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because MWAA resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## PARTIES

7.     Plaintiff Baltimore-DC Building Trades is a labor organization chartered by North America's Building Trades Unions and is composed of twenty-two local building and construction trades unions in Maryland, Washington, D.C., and Northern Virginia.  The Baltimore-DC Building Trades works to secure improved wages, hours and working conditions for the construction workers it represents through collective bargaining, including the negotiation of PLAs.

8.     Defendant MWAA is a public body corporate and politic with powers and jurisdiction conferred jointly by the legislative authority of Virginia and the District of Columbia. It is a political subdivision that is independent of Virginia and its local governments, the District of Columbia, and the United States Government, and it is authorized to operate and improve the

Ronald Reagan Washington National Airport and the Washington Dulles International Airport.  49 U.S.C. § 49106.

## FACTS

**I.    MWAA Operates and Makes Improvements to Two Airports in the Washington, D.C. Metropolitan Area Under a Lease with the Federal Government.**

9.    Before 1987, the federal government owned and was responsible for operating the Ronald Reagan Washington National Airport and the Washington Dulles International Airport.  *See MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 255 (1991).

10.    But in the early 1980s, the Secretary of Transportation determined that keeping the two airports under federal control hindered efforts to raise money for capital improvements.  An advisory committee appointed in 1984 recommended creating a regional authority to assume operation of the airports.  *See Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. at 257.

11.    In 1985, Virginia and the District of Columbia passed statutes creating MWAA, a new, independent public body responsible for acquiring the two airports from the federal government.  D.C. Code § 9-902; Va. Code Ann. § 5.1-153.

12.    Congress enacted the Metropolitan Washington Airports Act ("Enabling Act") a year later.  Pub. L. No. 99-500, 100 Stat. 1783, 1783-373 to 1783-385 (codified at 49 U.S.C. § 49101 *et seq.*).  Congress's intent was to preserve the federal government's "continuing but limited interest in the operation of" the two airports, while also "tak[ing] into account the interest of nearby communities, the traveling public, air carriers, general aviation, airport employees, and other interested groups," including state governments.  49 U.S.C § 49101(3), (6).  Congress also intended to "facilitate timely improvements at both airports to meet the growing demand of interstate air transportation."  *Id.* § 49101(4).

13.    The Enabling Act transferred operating responsibility for the two D.C.-area airports

to MWAA. 49 U.S.C. § 49102(a). To protect the federal government's interest, that transfer was to be done by a lease. *Id.*; *see also id.* § 49101(10).

14.    The Enabling Act established several required terms for the lease, including:

    a.    "In acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, the Airports Authority to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures," 49 U.S.C. § 49104(a)(4); and

    b.    "The Comptroller General may conduct periodic audits of the activities and transactions of the Airports Authority in accordance with generally accepted management principles," 49 U.S.C. § 49104(a)(7).

15.    As amended, the Enabling Act also provides that the Comptroller General of the United States will "review contracts of the Airports Authority to decide whether the contracts were awarded by procedures that follow sound Government contracting principles." 49 U.S.C. § 49106(g).

16.    The Enabling Act gives jurisdiction to federal district courts to compel MWAA to comply with the terms of its lease. 49 U.S.C. § 49104(c). Under Section 6005(e), any aggrieved party may sue for a breach of the lease. Pub. L. No. 99-500, 100 Stat. 1783, 1783-378.

17.    The Secretary of Transportation and MWAA entered into a fifty-year lease on March 2, 1987. A true and correct copy of that lease, as amended, is attached hereto as Exhibit A.

18.    The lease includes provisions required by the Enabling Act:

    a.    Under Article 11.D, "[i]n acquiring by contract supplies or services for an amount estimated to be in excess of $200,000, or awarding concession

contracts, the Airports Authority shall obtain, to the maximum extent practicable, full and open competition through the use of published competitive procedures;" and

b.    Under Article 25, "[t]he Comptroller General of the United States . . . may conduct periodic audits of the activities and transactions of the Airports Authority in accordance with generally accepted management principles."

19.    Under Article 11.K of the lease, MWAA must "adopt, maintain, and adhere to policies and procedures in the areas of procurement and contracting . . . .  These policies and procedures should be substantially similar to those of similar public entities and should strive to reflect a standard of 'best practices.'"

20.    Article 24.A of the lease states that "the district courts of the United States shall have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of this lease.  An action may be brought . . . by any aggrieved party."

## II.    Resolution 22-35 Incorporates a PLA Requirement for All Large-Scale Construction Projects Eligible to Receive Discretionary Federal Funding.

21.    At its November 16, 2022 meeting, MWAA's Board of Directors considered a staff recommendation to implement a PLA requirement for large-scale construction projects.  A true and correct copy of the staff report is attached hereto as Exhibit B.

22.    PLAs are comprehensive prehire collective bargaining agreements negotiated between building and construction trades unions, like the Baltimore-DC Building Trades, and owners, contractors, or construction managers.

23.    Congress authorized the use of PLAs under Sections 8(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 158(e), (f).  Section 8(f) allows unions and employers in the construction industry to enter into prehire agreements that will apply after the employer hires

workers and begins construction.  Section 8(e) generally prohibits agreements that limit the entities with which an employer may do business, but it contains a construction-industry proviso that permits agreements to limit work on a construction project to contractors that agree to be bound by the PLA.

24.     In the construction industry, contractors often hire employees on a short-term basis, and contracts are commonly let to multiple contractors and subcontractors, each performing part of the job.  PLAs accommodate these issues by establishing a single labor relations structure that applies to all contractors, subcontractors, and employees operating on the construction project for the project's duration.

25.     PLAs set standard work rules, establish various forums for communication and coordination, and prevent work stoppages with no-strike, no-lockout provisions and speedy dispute-resolution mechanisms.  They also set standard pay and benefit rates for each trade and address labor supply issues through provisions that commit the signatory unions to use their job referral procedures.  By requiring all contractors to be bound by a single labor contract, PLAs ensure that work rules and conditions on a construction project are standardized, eliminating the numerous conflicting practices of the individual contractors.

26.     PLAs have been used in both the public and private sector for decades.  The federal government has used PLAs to systematize labor relations on its large and complex construction projects since at least 1938.  *See, e.g.*, U.S. Gen. Acct. Off., GAO/GGD-98-82, *Project Labor Agreements: The Extent of Their Use and Related Information* 4 (1998) (tracing the use of PLAs on federal and other publicly funded projects back to the construction of the Grand Coulee Dam

in Washington State in 1938 and the Shasta Dam in California in 1940).[1]

27.     The staff report explained that PLAs can "provid[e] structure and stability to large-scale construction projects and can help avoid uncertainties" associated with large-scale projects. "PLAs can help avoid labor related disruptions on projects" and "secure the commitment of all stakeholders on a construction project that the project will proceed efficiently without interruption."

28.     The staff report explained that under the Bipartisan Infrastructure Law, the Federal Aviation Administration was expected to award approximately $20 billion in grant funds to airport sponsors for airport infrastructure.  MWAA had been awarded $49.6 million in funding for the Tier 2 Concourse-East project at the Washington Dulles International Airport in fiscal year 2022.

29.     To be eligible for funding under the Bipartisan Infrastructure Law, airport sponsors were required under Department of Transportation guidelines to use PLAs to the extent consistent with Executive Order 14063.

30.     President Biden issued Executive Order 14063, titled "Use of Project Labor Agreements for Federal Construction Projects," on February 4, 2022.  87 Fed. Reg. 7,363 (Feb. 9, 2022).

31.     Executive Order 14063 applies to "large-scale construction projects," which Section 2(c) of the order defines as domestic federal construction projects "for which the total estimated cost of the construction contract to the Federal Government is $35 million or more."  87 Fed. Reg. at 7,363.

32.     In accordance with Section 3 of Executive Order 14063, agencies must "require

---

[1]     https://www.gao.gov/assets/ggd-98-82.pdf

every contractor or subcontractor engaged in construction on [a large-scale construction] project to agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." 87 Fed. Reg. at 7,364.

33.    Section 4 provides several requirements for PLAs negotiated under the order:

    a.    They must "bind all contractors and subcontractors on the construction project";

    b.    They must "allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements";

    c.    They must "contain guarantees against strikes, lockouts, and similar job disruptions";

    d.    They must contain "effective, prompt, and mutually binding procedures for resolving labor disputes";

    e.    They must "provide other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health"; and

    f.    They must "fully conform to all statutes, regulations, Executive Orders, and Presidential Memoranda."

87 Fed. Reg. at 7,364.

34.    Under Section 5 of the order, agencies "may grant an exception" from the PLA requirement "for a particular contract by, no later than the solicitation date, providing a specific written explanation" of why one or more enumerated circumstances "exists with respect to that contract." 87 Fed. Reg. at 7,364.

35.     Last year, after several agencies implemented policies at odds with Executive Order 14063, the Baltimore-DC Building Trades joined a lawsuit that led to a preliminary injunction against the agencies.  *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290 (D.D.C. 2025).  Shortly after the preliminary injunction issued, the Trump Administration reaffirmed that "Executive Order (E.O.)14063 remains in effect."  Off. of Mgmt. & Budget, M-25-29, *Use of Project Labor Agreements on Federal Construction Projects — Amendments to OMB Memorandum M-24-06* (June 12, 2025).[2]

36.     The staff report noted that PLAs were used in connection with Phase 1 of the Silver Line project and that Virginia law permits the use of PLAs on public projects.  MWAA itself included a PLA requirement in the contract for the Dulles Tier 2 Concourse-East Phase I project.

37.     "Anticipating additional [Bipartisan Infrastructure Law] grant funding opportunities for Tier 2 and other large-scale construction projects at both Dulles International and Ronald Reagan Washington National Airports, ***as well as other [Department of Transportation] grant opportunities***," the staff report recommended that a PLA requirement "be included in ***all contracts*** for large-scale construction projects with potential [Bipartisan Infrastructure Law] and other [Department of Transportation] funding" (emphases added).

38.     MWAA's Board of Directors agreed with the staff recommendation and passed Resolution 22-35, titled "Implementing a Project Labor Agreement Requirement for Certain Federally Funded Construction Projects," at the November 2022 meeting.  A true and correct copy of Resolution 22-35 is attached hereto as Exhibit C.

---

[2]     https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-29-Use-of-Project-Labor-Agreements-on-Federal-Construction-Projects-Amendments-to-OMB-Memorandum-M-24-06.pdf

39.     Resolution 22-35 begins by describing Executive Order 14063, which "sets forth the policy of the Federal government for agencies to use a project labor agreement (PLA) in connection with construction projects which are large-scale."  Resolution 22-35 also explains the federal funding opportunities available to MWAA and reiterates that MWAA used a PLA on the Dulles Tier 2 Concourse-East Phase I project.

40.     An earlier draft of Resolution 22-35 would have required PLAs on projects "for which the total estimated cost of the construction contract is $35 million or more for which the Airports Authority *seeks* to receive discretionary Federal funding" (emphasis added).  A true and correct copy of the earlier draft of the staff report containing that language is attached as Exhibit D.

41.     However, the adopted (and still binding) version of Resolution 22-35 directs staff "to incorporate a PLA requirement, in accordance with the EO, for all large-scale construction projects, defined as a construction project for which the total estimated cost of the construction contract is $35 million or more for which the Airports Authority *is eligible* to receive discretionary Federal funding" (emphasis added).

42.     Resolution 22-35 has not been rescinded and is still in effect.

**III.    The Baltimore-DC Building Trades Enters into PLAs on MWAA Projects.**

43.     The Baltimore-DC Building Trades negotiated the PLA that MWAA required on the Dulles Tier 2 Concourse-East Phase I project, reaching an agreement with Turner Construction Company in August 2023.  A true and correct copy of the Dulles Tier 2 Concourse-East Phase I PLA is attached hereto as Exhibit E.

44.     Under Article III of the PLA, Turner Construction Co. and its subcontractors agreed to recognize the Baltimore-DC Building Trades and its affiliated unions as the "sole and exclusive bargaining representatives of all craft employees within their respective jurisdictions working on

the Project within the scope of th[e] Agreement."

45.     Article X sets key terms and conditions of work on the project, including wages and benefits, hours of work, and scheduled holidays.  Article X also commits the parties to promoting safety and health on the jobsite.

46.     Article X, Section 1 requires contractors to hire applicants through signatory unions' referral procedures, and Article X, Section 2 sets an apprentice utilization goal for the project.

47.     Article VI sets a uniform, three-step grievance procedure for resolving disputes under the PLA, and Article VII provides for rapid resolution of union craft jurisdictional disputes.

48.     Article V of the PLA prohibits strikes, slowdowns, lockouts, and other work stoppages.

49.     Construction of the Dulles Tier 2 Concourse-East Phase I project has proceeded according to schedule, and in July 2025, employees placed the final structural steel beam.  *See* Jim Parsons, *New Dulles Airport Concourse Reaches Construction Milestone*, Eng'g News-Record (July 24, 2025).[3]

50.     But for MWAA's unlawful decision to stop complying with Resolution 22-35, the Baltimore-DC Building Trades anticipated negotiating and entering into additional PLAs for large-scale MWAA construction projects, including Phases II and III of the Dulles Tier 2 Concourse-East project.

## IV.     MWAA Has Stopped Complying with Resolution 22-35.

51.     On information and belief, MWAA is refusing to require PLAs on solicitations for

---

[3]     https://www.enr.com/articles/61094-new-dulles-airport-concourse-reaches-construction-milestone

large-scale construction projects for which MWAA is eligible to receive discretionary federal funding.

52.     For example, in an October 21, 2025 email to Baltimore-DC Building Trades President Greg Akerman, MWAA Senior Vice President and General Counsel Ashley Carvalho confirmed that MWAA was refusing to require a PLA on a solicitation for the Dulles Tier 2 Concourse-East Phase II and III projects and the Central Utility Plant project, which were bid together in a single solicitation.  Phases II and III, like Phase I of the project, are eligible for federal Airport Improvement Program ("AIP") funding.

53.     And on December 31, 2025, MWAA issued a solicitation (RFP-25-24866) for the construction of North Airfield improvements at the Ronald Reagan Washington National Airport. A true and correct copy of that solicitation is attached hereto as Exhibit F.

54.     The North Airfield improvements solicitation includes the demolition and removal of existing pavements and structures, paving work, and the installation of storm drainage systems, a jet blast protection fence, aircraft lighting and signage, and electrical infrastructure, among other job tasks.  This is the type of construction work performed by members of the Baltimore-DC Building Trades' affiliated unions.

55.     The estimated cost of the North Airfield improvements project is $109.4 million — far above Resolution 22-35's $35 million threshold.

56.     According to the North Airfield improvements solicitation, MWAA "anticipates utilizing Federal Aviation Administration (FAA) Airport Improvement Program funds for this Work."

57.     Though the North Airfield improvements project is a large-scale construction project for which MWAA is eligible to receive discretionary federal funding, the solicitation was

issued without a PLA requirement.

**V.     The Baltimore-DC Building Trades Has Been Irreparably Harmed.**

58.     Under Resolution 22-35, MWAA must require PLAs on construction projects with a total cost over $35 million that are eligible to receive discretionary federal funding.

59.     To comply with solicitations issued under Resolution 22-35, contractors must enter into PLAs with unions like the Baltimore-DC Building Trades.

60.     MWAA's refusal to comply with Resolution 22-35 and include PLA requirements in its large-scale construction contracts harms the Baltimore-DC Building Trades' bargaining position. Prior to MWAA's decision not to comply with Resolution 22-35, the Baltimore-DC Building Trades could rely on the PLA requirement in its negotiations with MWAA contractors. MWAA's decision not to comply with Resolution 22-35 damages the Baltimore-DC Building Trades' bargaining position, because MWAA is not requiring contractors to negotiate PLAs for MWAA work. Unless MWAA's unlawful refusal to comply with Resolution 22-35 is enjoined, the Baltimore-DC Building Trades will continue to be harmed.

61.     The contrast between the Dulles Tier 2 Concourse-East Phase I project and the North Airfield improvements solicitation demonstrates the irreparable and ongoing harm to the Baltimore-DC Building Trades' bargaining position. MWAA required a PLA in the Dulles Tier 2 Concourse-East Phase I solicitation, which gave a benefit to the Baltimore-DC Building Trades in its bargaining with bidding contractors. The Baltimore-DC Building Trades expected (and expects) a similar benefit in future negotiations with contractors looking to perform MWAA work while Resolution 22-35 remains in effect. But the North Airfield improvements solicitation does not contain a PLA requirement, meaning a contractor could win the solicitation without entering into a PLA with the Baltimore-DC Building Trades. Unlike in other solicitations where a PLA was required, the Baltimore-DC Building Trades is now forced to rely on contractors' wholly

voluntary decision about whether a PLA makes business sense.

62.    Because the Baltimore-DC Building Trades has suffered, and will continue to suffer, an irreparable harm to its bargaining position traceable to MWAA's refusal to comply with Resolution 22-35, the Baltimore-DC Building Trades has standing to seek redress.

**CLAIM FOR RELIEF**
**Violation of Lease**
**Enabling Act § 6005(e), Pub. L. No. 99-500, 100 Stat. 1783, 1783-378**
**(codified at 49 U.S.C. § 59104(c))**

63.    The Baltimore-DC Building Trades incorporates by reference each of the paragraphs in this Complaint as if restated fully herein.

64.    Section 6005(e) of the Enabling Act gives federal district courts the authority "to compel the Airports Authority and its officers and employees to comply with the terms of the lease."  Pub. L. No. 99-500, 100 Stat. 1783, 1783-378 (codified at 49 U.S.C. § 49104(c)).

65.    Under Article 11.K of the lease, MWAA must "adopt, maintain, and adhere to policies and procedures in the areas of procurement and contracting."

66.    For contracts in excess of $200,000, Article 11.D of the lease incorporates the requirement at 49 U.S.C. § 49104(a)(4) that MWAA obtain open competition "through the use of published competitive procedures."

67.    Article 25 of the lease authorizes the Comptroller General of the United States to conduct periodic audits of MWAA's activities "in accordance with generally accepted management principles."  Relatedly, 49 U.S.C. § 49106(g) requires that MWAA's contracting procedures "follow sound Government contracting principles."

68.    Resolution 22-35 requires MWAA to "incorporate a PLA requirement, in accordance with [Executive Order 14063], for all large-scale construction projects, defined as a construction project for which the total estimated cost of the construction contract is $35 million

or more for which the Airports Authority is eligible to receive discretionary Federal funding."

69.    Resolution 22-35 has not been rescinded.  MWAA is bound to comply with Resolution 22-35's PLA requirement, or else the requirements in Articles 11.D, 11.K, and 25 of the lease would be "hollow and toothless promise[s]."  *Wash.-Dulles Transp., Ltd. v. MWAA*, 263 F.3d 371, 376 (4th Cir. 2001).

70.    MWAA has refused to require PLAs on large-scale construction projects eligible to receive discretionary federal funding.

71.    Therefore, MWAA has violated its lease.

## PRAYER FOR RELIEF

**WHEREFORE,** the Baltimore-DC Building Trades respectfully requests the following relief:

A.    A declaration, pursuant to 28 U.S.C. § 2201, that MWAA has violated its lease by refusing to require PLAs on large-scale construction projects eligible to receive discretionary federal funding;

B.    A preliminary and permanent injunction requiring MWAA to implement a PLA requirement, in accordance with Resolution 22-35, for all large-scale construction projects eligible to receive discretionary federal funding;

C.    A preliminary and permanent injunction enjoining MWAA from awarding contracts without a PLA on large-scale construction projects eligible to receive discretionary federal funding, in violation of Resolution 22-35;

D.    An order granting costs to the Baltimore-DC Building Trades; and

E.    Any other nonmonetary relief the Court deems appropriate.

Respectfully submitted,

/s/ Lucas R. Aubrey
Lucas R. Aubrey
   Va. Bar No. 74641
Jacob J. Demree*
*Attorneys for the Baltimore-D.C. Metro*
*Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com
demree@shermandunn.com

* Pro hac vice admission pending

January 30, 2026

16