**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **Baltimore-D.C. Metro Building and Construction Trades Council,** | |
| *Plaintiff,* | |
| v. | No. 1:26-cv-00296-PTG-WEF |
| **Metropolitan Washington Airports Authority,** | |
| *Defendant.* | |

**MEMORANDUM IN SUPPORT OF BALTIMORE-D.C. METRO
BUILDING AND CONSTRUCTION TRADES COUNCIL'S
MOTION FOR A PRELIMINARY INJUNCTION**

Lucas R. Aubrey
    Va. Bar No. 74641
Jacob J. Demree, PHV
*Attorneys for the Baltimore-D.C. Metro
Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com
demree@shermandunn.com

February 13, 2026

**TABLE OF CONTENTS**

Table of Authorities..................................................................................................... iii

Introduction................................................................................................................. 1

Statement of Facts....................................................................................................... 2

    I.       Project Owners Use Project Labor Agreements to Manage Large-Scale
            Construction Projects. ............................................................................ 2

    II.      MWAA Uses Project Labor Agreements to Organize Its Large-Scale,
            Federally Funded Construction Projects. ................................................ 4

    III.    The Baltimore-DC Building Trades and Its Affiliates Have Provided
            Stable Terms and Conditions of Work and Qualified Employees for the
            Construction of MWAA Infrastructure. .................................................. 7

    IV.    MWAA Abruptly Stopped Requiring Project Labor Agreements on Large-
            Scale Projects Eligible for Federal Funding. .......................................... 8

Legal Standard ........................................................................................................... 9

Argument .................................................................................................................. 10

    I.       The Baltimore-DC Building Trades Is Likely to Succeed on the Merits. ............. 10

         A.      The Baltimore-DC Building Trades Has Standing. ................................. 10

         B.      MWAA's Lease Requires It to Comply with Procurement
               Policies Like Resolution 22-35. ............................................................. 12

         C.      MWAA Violated Its Lease by Failing to Comply with
               Resolution 22-35. ................................................................................. 14

    II.      The Baltimore-DC Building Trades Will Suffer Irreparable Harm Absent a
            Preliminary Injunction. ......................................................................... 18

    III.    The Balance of Equities and Public Interest Weigh in Favor of a
            Preliminary Injunction. ......................................................................... 20

Conclusion ............................................................................................................... 23

Certificate of Service ..................................................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*Arcamuzi v. Continental Air Lines, Inc.*,
  819 F.2d 935 (9th Cir. 1987) .........................................................................................19

*Balt. Gas & Elec. Co. v. United States*,
  133 F. Supp. 2d 721 (D. Md. 2001), *appeal dismissed*, 290 F.3d 734 (4th Cir.
  2002) ........................................................................................................................ 11-12

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors
  of Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218 (1993) ...........................................3, 22

*Clinton v. City of New York*,
  524 U.S. 417 (1998).......................................................................................................10

*Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*,
  No. 25-cv-1458, 2025 U.S. Dist. LEXIS 127611 (D. Md. July 7, 2025) .........................19

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018)........................................................................................................15

*Feliciano v. Dep't of Transp.*,
  605 U.S. 38 (2025).........................................................................................................15

*Ind. Mun. Power Agency v. United States*,
  154 Fed. Cl. 752 (2021) ................................................................................................17

*Kerpen v. MWAA*,
  907 F.3d 152 (4th Cir. 2018) .........................................................................................21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).......................................................................................................10

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) .........................................................................................18

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
  22 F.3d 546 (4th Cir. 1994) ........................................................................................ 18-19

*MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*,
  501 U.S. 252 (1991)..........................................................................................................4

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025)........................................................................4, 11, 19

*Nken v. Holder*,
       556 U.S. 418 (2009)..................................................................................................9

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
       131 F.4th 205 (4th Cir. 2025) ................................................................................19

*Roe v. Shanahan*,
       359 F. Supp. 3d 382 (E.D. Va. 2019) .....................................................................21

*Roe v. U.S. Dep't of Def.*,
       947 F.3d 207 (4th Cir. 2020) ..................................................................................21

*Salient CRGT, Inc. v. Sols. By Design II, LLC*,
       No. 20-cv-236, 2020 U.S. Dist. LEXIS 117170 (E.D. Va. Apr. 2, 2020) .........................19

*Spokeo, Inc. v. Robins*,
       578 U.S. 330 (2016)................................................................................................10

*Starbucks Corp. v. McKinney*,
       602 U.S. 339 (2024)..................................................................................................9

*Univ. of Tex. v. Camenisch*,
       451 U.S. 390 (1981)..................................................................................................9

*Wash.-Dulles Transp., Ltd. v. MWAA*,
       263 F.3d 371 (4th Cir. 2001) ..................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
       555 U.S. 7 (2008).................................................................................................9, 20

**Statutes**

2 U.S.C. § 900(c)(7)................................................................................................16

2 U.S.C. § 900(c)(8)................................................................................................16

29 U.S.C. § 158(e) ...................................................................................................2

29 U.S.C. § 158(f)....................................................................................................2

49 U.S.C. § 47104(a) ..............................................................................................15

49 U.S.C. § 47111(a) ..............................................................................................15

49 U.S.C. § 47115(b) .......................................................................................... 15-16

49 U.S.C. § 48103 ...............................................................................................................17

49 U.S.C. § 48103(a) ..........................................................................................................14

49 U.S.C. § 49101(3) ............................................................................................................4

49 U.S.C. § 49101(4) ............................................................................................................4

49 U.S.C. § 49101(6) ............................................................................................................4

49 U.S.C. § 49101(10) ..........................................................................................................4

49 U.S.C. § 49102(a) ............................................................................................................4

49 U.S.C. § 49104(a)(4) ..............................................................................................4-5, 21-22

49 U.S.C. § 49104(a)(7) ........................................................................................................5

49 U.S.C. § 49104(c) ....................................................................................................... 12-13

49 U.S.C. § 49106(g) ........................................................................................................5, 21

Consolidated Appropriations Act, 2024 div. F, tit. I,
    Pub. L. No. 118-42, 138 Stat. 25, 311 ...............................................................................17

D.C. Code § 9-902 ................................................................................................................4

Full-Year Continuing Appropriations & Extensions Act, 2025 § 11301(3),
    Pub. L. No. 119-4, 139 Stat. 9, 38 ...................................................................................17

Pub. L. No. 99-500, 100 Stat. 1783, 1783-378 ........................................................................ 12-13

Va. Code Ann. § 5.1-153 .......................................................................................................4

**Other Authorities**

Discretionary, *Black's Law Dictionary* (11th ed. 2019) ................................................................15

Discretionary, *Webster's Third New International Dictionary* (2002).................................................15

Executive Order 12818, 57 Fed. Reg. 48,713 (Oct. 28, 1992) .........................................................3

Executive Order 12836, 58 Fed. Reg. 7,045 (Feb. 3, 1993) ...........................................................3

Executive Order 13202, 66 Fed. Reg. 11,225 (Feb. 22, 2001) ........................................................3

Executive Order 13208, 66 Fed. Reg. 18,717 (Apr. 11, 2001)......................................................3

Executive Order 13502, 74 Fed. Reg. 6,985 (Feb. 11, 2009) .......................................................3

Executive Order 14052, 86 Fed. Reg. 64,335 (Nov. 18, 2021) ..............................................8, 18

Executive Order 14063, 87 Fed. Reg. 7,363 (Feb. 9, 2022) .....................................3-6, 11, 18-19

FAA, *AIP Glossary*, https://www.faa.gov/airports/aip/aip_glossary (last visited Feb. 13,
    2026) ....................................................................................................................................16

FAA, *Airport Improvement Program (AIP) 2025-2027 Supplemental Appropriation*,
    https://www.faa.gov/airports/aip/aip_supplemental_appropriation (last visited
    Feb. 13, 2026) ......................................................................................................................17

FAA, *National Plan of Integrated Airport Systems (NPIAS) 2025-2029* app. A (Sept. 30,
    2024), https://www.faa.gov/sites/faa.gov/files/airports/planning_capacity/npias/
    current/ARP-NPIAS-2025-2029-Appendix-A.pdf ................................................................16

FAA, Order 5100.38D Change 1, *Airport Improvement Program Handbook* (Feb. 26,
    2019), https://www.faa.gov/documentLibrary/media/Order/AIP-Handbook-Order-
    5100-38D-Chg1.pdf ..............................................................................................................16

FAA, *Overview: What Is AIP & What Is Eligible?*,
    https://www.faa.gov/airports/aip/overview (last visited Feb. 13, 2026)...........................14

MWAA, Bylaws (Nov. 19, 2025), https://www.mwaa.com/sites/mwaa.com/files/Bylaws
    %202025.pdf.........................................................................................................................13

MWAA, Contracting Manual (June 26, 2025), https://www.mwaa.com/sites/mwaa.com/
    files/2025-06/Contracting%20Manual-v5_3-06-2025_1.pdf ..............................................13

U.S. Gen. Acct. Off, GAO/GGD-98-82, *Project Labor Agreements: The Extent of Their
    Use and Related Information* (1998), https://www.gao.gov/assets/ggd-98-82.pdf .............3

U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*
    (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ...................................... 16-17

## INTRODUCTION

A Metropolitan Washington Airports Authority ("MWAA") procurement policy requires it to use project labor agreements ("PLAs") on large-scale construction projects eligible to receive discretionary federal funding. MWAA is defying that requirement by issuing solicitations without PLA requirements.

MWAA previously required a PLA on the multimillion-dollar Dulles Tier 2 Concourse-East Phase I project, which the Baltimore-D.C. Metro Building and Construction Trades Council ("Baltimore-DC Building Trades") negotiated with the winning contractor. The Baltimore-DC Building Trades is a labor organization composed of twenty-two local building and construction trades unions in the Maryland, Washington, D.C., and Northern Virginia areas representing thousands of skilled construction workers. Though MWAA required a PLA on Phase I of the project, it is not requiring a PLA for Phases II and III. Nor is MWAA requiring a PLA for a project at the Ronald Reagan Washington National Airport, the solicitation for which is set to close in early March.

Both the Phase II and III project and the Ronald Reagan Washington National Airport project are large-scale construction projects eligible to receive discretionary federal funding. Therefore, they are subject to MWAA's PLA policy. By disobeying its own binding procurement procedures, MWAA is forcing the Baltimore-DC Building Trades away from the bargaining table. Pending resolution of this case, the Court should grant a preliminary injunction to prevent MWAA from violating its PLA policy and irreparably harming the Baltimore-DC Building Trades and the thousands of construction workers it represents.

1

**STATEMENT OF FACTS**

**I.      Project Owners Use Project Labor Agreements to Manage Large-Scale Construction Projects.**

PLAs are comprehensive collective bargaining agreements negotiated between building and construction trades unions, like the Baltimore-DC Building Trades, and owners, contractors, or construction managers.  Congress authorized the use of PLAs under Sections 8(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 158(e), (f).  Section 8(f) allows employers in the construction industry to sign *prehire* agreements with building and construction trades unions.  Therefore, prior to beginning a construction project, a contractor can sign a collective bargaining agreement with building and construction trades unions to guarantee a reliable source of qualified employees, even though employees have not yet been hired.

Section 8(e)'s construction-industry proviso allows contractors to enter into agreements with labor organizations that limit work on a construction project to those contractors that agree to be bound by the collective bargaining agreement covering the project.  That proviso is an exception to the general rule that an employer and a union may not enter into "hot cargo" agreements, in which the employer agrees not to do business with another company.  Together, Sections 8(e) and (f) allow for prehire collective bargaining agreements covering all work on a construction project irrespective of whether the work is subcontracted.  That's precisely what a PLA is — a prehire collective bargaining agreement applicable to all contractors and subcontractors performing covered work on a construction site.

PLAs ensure that work rules and conditions on a construction project are standardized, meaning that all employees on the project are subject to the same terms and conditions of work. PLAs set standard work rules; establish forums for communication and coordination; and include no-strike, no-lockout provisions and speedy dispute-resolution mechanisms.  They also set

2

standard pay and benefit rates and provide for hiring through signatory unions' job referral systems. *See, e.g.*, *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* (*Boston Harbor*), 507 U.S. 218, 221-22, 230-32 (1993).

The federal government has used PLAs to systematize labor relations on large and complex construction projects since at least 1938. *See, e.g.*, U.S. Gen. Acct. Off., GAO/GGD-98-82, *Project Labor Agreements: The Extent of Their Use and Related Information* 4 (1998) (tracing the use of PLAs on federal and other publicly funded projects back to the construction of the Grand Coulee Dam in Washington State in 1938 and the Shasta Dam in California in 1940).[1] Presidents have issued executive orders and directives with respect to the use of PLAs on federal contracts since the 1990s.[2]

On February 4, 2022, President Biden issued Executive Order 14063, titled "Use of Project Labor Agreements for Federal Construction Projects." Decl. of Greg Akerman ¶ 29, Ex. G, 87 Fed. Reg. 7,363 (Feb. 9, 2022) [hereinafter Akerman Decl.]. Section 3 of that order directs agencies to "require every contractor or subcontractor engaged in construction on [a large-scale construction] project to agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." 87 Fed. Reg. at 7,364. Section 4 provides several requirements for PLAs negotiated under the order, including that they have guarantees against job disruptions, include effective and prompt dispute-resolution procedures,

---

[1]     https://www.gao.gov/assets/ggd-98-82.pdf

[2]     *See* Executive Order 12818, 57 Fed. Reg. 48,713 (Oct. 28, 1992) (issued by President George H.W. Bush); Executive Order 12836, 58 Fed. Reg. 7,045 (Feb. 3, 1993) (issued by President Clinton); Executive Order 13202, 66 Fed. Reg. 11,225 (Feb. 22, 2001), amended by Executive Order 13208, 66 Fed. Reg. 18,717 (Apr. 11, 2001) (issued by President George W. Bush); Executive Order 13502, 74 Fed. Reg. 6,985 (Feb. 11, 2009) (issued by President Obama).

and allow contractors and subcontractors to work on the project regardless of whether they are otherwise parties to other collective bargaining agreements. *Id.* Section 5 of the order allows agencies to grant exceptions from the PLA requirement on a project-by-project basis. *Id.*

Executive Order 14063 is still in effect. Last year, in fact, the Baltimore-DC Building Trades joined a lawsuit to enforce Executive Order 14063 after several federal agencies implemented policies at odds with the order's requirements. That lawsuit led to a preliminary injunction against the agencies. Akerman Decl. ¶ 30; *see N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290 (D.D.C. 2025). Shortly after that preliminary injunction issued, the Trump Administration reaffirmed that "Executive Order (E.O.)14063 remains in effect." Akerman Decl. ¶ 30, Ex. H.

## II. MWAA Uses Project Labor Agreements to Organize Its Large-Scale, Federally Funded Construction Projects.

Virginia and the District of Columbia established MWAA in 1985 to operate the Ronald Reagan Washington National Airport and the Washington Dulles International Airport. *See* D.C. Code § 9-902; Va. Code Ann. § 5.1-153. Before then, the federal government was responsible for operating the two airports. *See MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 255 (1991). Congress enacted the Metropolitan Washington Airports Act ("Enabling Act") in 1986 to formally transfer ownership of the airports to the new entity. 49 U.S.C. § 49102(a).

Congress intended to "facilitate timely improvements at both airports to meet the growing demand of interstate air transportation," 49 U.S.C. § 49101(4), while also taking into account the interests of the federal government, state governments, nearby communities, traveling public, air carriers, and airport employees, *id.* § 49101(3), (6). It achieved these goals with a lease. *Id.* §§ 49101(10); 49102(a). Under the Enabling Act, the lease was to require the use of "complete

4

and open competition through the use of published competitive procedures" for contracts estimated to exceed $200,000, *id.* § 49104(a)(4), and allow the Comptroller General of the United States to periodically audit MWAA's transactions "in accordance with generally accepted management principles," *id.* § 49104(a)(7).  As amended, the Enabling Act also provides that the Comptroller General will review MWAA's contracts "to decide whether the contracts were awarded by procedures that follow sound Government contracting principles."  *Id.* § 49106(g).

MWAA entered into a lease with the United States on March 2, 1987.  *See* Akerman Decl. Ex. B.  That lease incorporates provisions required by the Enabling Act.  Specifically, Article 11.D requires MWAA to "obtain, to the maximum extent practicable, full and open competition through the use of published competitive procedures" for contracts estimated to exceed $200,000, and Article 25 allows the Comptroller General to audit MWAA "in accordance with generally accepted management principles."  *Id.* ¶¶ 16, 18.  Article 11.K of that lease provides further that MWAA must "adopt, maintain, and adhere to policies and procedures in the areas of procurement and contracting," which "should be substantially similar to those of similar public entities and should strive to reflect a standard of 'best practices.'"  *Id.* ¶ 17.

On November 16, 2022, MWAA adopted one such procurement policy.  Akerman Decl. ¶ 19.  A staff report had indicated that the Federal Aviation Administration ("FAA") was expected to award approximately $20 billion in grant funds to airport sponsors for airport infrastructure under the Bipartisan Infrastructure Law.  *See id.* Ex. D.  To be eligible for that funding, airport sponsors were required under Department of Transportation guidelines to use PLAs, to the extent consistent with Executive Order 14063.  *Id.*  The staff report explained that PLAs can "provid[e] structure and stability to large-scale construction projects and can help avoid uncertainties" associated with large-scale projects.  *Id.* ¶ 21.  "PLAs can help avoid labor related disruptions on

5

projects" and "secure the commitment of all stakeholders on a construction project that the project will proceed efficiently without interruption." *Id.* The report recommends requiring PLAs on "all contracts for large-scale construction projects with potential [Bipartisan Infrastructure Law] and other [Department of Transportation] funding." *Id.* ¶ 22.

MWAA agreed with the staff report's recommendations and adopted Resolution 22-35 on November 16, 2022. Akerman Decl. ¶ 19, Ex. C. Resolution 22-35 explains that Executive Order 14063 "sets forth the policy of the Federal government for agencies to use a project labor agreement (PLA) in connection with construction projects which are large-scale, defined as a project for which the total estimated cost of the construction project is $35 million or more." *Id.* ¶ 31. Citing federal funding opportunities, Resolution 22-35 states that MWAA "expects that FAA NOFOs [Notices of Funding Opportunities] for future allocations of [Airport Terminal Program] and other discretionary grants will continue to incorporate the EO and request information about the use of project labor agreements." *Id.* Ex. C.

The resolution proposed in an early draft of the staff report would have required PLAs on any "construction project for which the total estimated cost of the construction contract is $35 million or more for which the Airports Authority *seeks* to receive discretionary Federal funding." Akerman Decl. ¶ 23, Ex. E (emphasis added). The effect of that resolution would have been to require PLAs only on projects where MWAA actually applied for federal funding. If a project was eligible for funding, but MWAA did not seek that funding, no PLA would have been required. However, MWAA adopted broader language that directed staff "to incorporate a PLA requirement, in accordance with the EO, for all large-scale construction projects, defined as a construction project for which the total estimated cost of the construction contract is $35 million or more for which the Airports Authority *is eligible* to receive discretionary Federal funding." *Id.* ¶ 24

6

(emphasis added).

Resolution 22-35 has not been rescinded and is still in effect. Akerman Decl. ¶ 24. Therefore, solicitations for large-scale MWAA construction projects eligible for federal funding should still have a PLA requirement.

**III.    The Baltimore-DC Building Trades and Its Affiliates Have Provided Stable Terms and Conditions of Work and Qualified Employees for the Construction of MWAA Infrastructure.**

As the staff report acknowledges, MWAA included a PLA requirement in the contract for the Dulles Tier 2 Concourse-East Phase I project. Akerman Decl. Ex. D. The Dulles Tier 2 Concourse-East project is a multimillion-dollar project to build a new fourteen-gate concourse facility to replace part of Washington Dulles International Airport's Concourse A. *Id.* ¶ 8. The project is partially funded using federal grant money: In 2025, the project was awarded $89.8 million in federal funding under the FAA's Airport Improvement Program. *Id.* ¶ 33. Construction, which is ongoing, has gone according to schedule. *Id.* ¶ 14. Last July, employees placed the final structural steel beam for Phase I. *Id.*

The Baltimore-DC Building Trades negotiated the PLA for Phase I of the project with Turner Construction Company ("Turner"). Akerman Decl. ¶ 6, Ex. A. Article III of the PLA requires Turner and its subcontractors to recognize the Baltimore-DC Building Trades and its affiliated unions as the "sole and exclusive bargaining representatives of all craft employees within their respective jurisdictions working on the Project within the scope of th[e] Agreement." *Id.* ¶ 9. Article X, Section 1 requires Turner and its subcontractors to hire applicants through signatory unions' referral procedures, and Article X, Section 2 sets an apprentice utilization goal for the project. *Id.* ¶ 11. The PLA also sets wages and benefits, hours of work, scheduled holidays, and other key terms and conditions of work on the project, as well as commits the parties to promoting safety and health on the jobsite. *Id.* ¶ 10. The PLA further provides for efficient dispute resolution

7

with minimal job interruptions:  Article VI sets a three-step grievance procedure, Article VII provides for rapid resolution of union craft jurisdictional disputes, and Article V prohibits strikes, slowdowns, lockouts, and other work stoppages.  *Id.* ¶¶ 12-13.

With the adoption of Resolution 22-35, the Baltimore-DC Building Trades anticipated that MWAA would continue to require PLAs on large-scale construction projects eligible to receive discretionary federal funding.  Akerman Decl. ¶ 25.  The Dulles Tier 2 Concourse-East project, for example, is ongoing and has several remaining phases of construction.  *Id.*

**IV.    MWAA Abruptly Stopped Requiring Project Labor Agreements on Large-Scale Projects Eligible for Federal Funding.**

In October 2025, MWAA communicated to the Baltimore-DC Building Trades that it no longer intended to comply with Resolution 22-35.  Akerman Decl. ¶ 26.  MWAA Senior Vice President and General Counsel Ashley Carvalho emailed Baltimore-DC Building Trades President Greg Akerman on October 21, explaining that "[f]ollowing the rescission of Executive Order 14052," MWAA issued a solicitation for the Dulles Tier 2 Concourse-East Phase II and III and Central Utility Plant project *without* a PLA requirement.  *Id.*  General Counsel Carvalho also claimed that "[f]or this Project, the Airports Authority was not eligible to receive discretionary grant funds." *Id.*

Counsel for the Baltimore-DC Building Trades sent a letter to General Counsel Carvalho on November 20, 2025, urging MWAA to follow Resolution 22-35.  Akerman Decl. ¶ 34.  The Northern Virginia congressional delegation had sent a similar letter the day before.  *Id.* Nevertheless, MWAA has doubled down and issued another solicitation without a PLA requirement.  On December 31, 2025, MWAA solicited bids for the construction of North Airfield improvements at the Ronald Reagan Washington National Airport.  Akerman Decl. ¶ 35, Ex. I. That project involves the demolition and removal of existing pavements and structures, paving

work, and the installation of storm drainage systems, a jet blast protection fence, aircraft lighting and signage, and electrical infrastructure — all construction tasks regularly performed by members of the Baltimore-DC Building Trades' affiliated unions. *Id.* ¶ 36. The North Airfield improvements project is estimated to cost $109.4 million (well over Resolution 22-35's $35 million threshold). *Id.* ¶ 37. The solicitation also expressly states that MWAA "anticipates utilizing Federal Aviation Administration (FAA) Airport Improvement Program funds for this Work." *Id.* Yet the solicitation issued without a PLA requirement. *Id.* ¶ 38.

The North Airfield improvements solicitation is currently set to close on March 3, 2026, and the Dulles Tier 2 Concourse-East Phase II and III and Central Utility Plant solicitation has already closed. Akerman Decl. ¶ 40. Though it would probably have negotiated PLAs on those projects had a PLA been required, the Baltimore-DC Building Trades is now set to lose work on those major projects, unless a contractor voluntarily decides that a PLA makes business sense. *Id.*

## LEGAL STANDARD

The purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A plaintiff seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent a preliminary injunction, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors — likelihood of success and irreparable harm — "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## ARGUMENT

**I.      The Baltimore-DC Building Trades Is Likely to Succeed on the Merits.**

**A.      *The Baltimore-DC Building Trades Has Standing.***

To establish standing, the Baltimore-DC Building Trades has to show an injury in fact that is fairly traceable to MWAA's violation of its lease and that is likely to be redressed by the requested relief. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Injury in fact" means "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). MWAA's refusal to include PLA requirements on solicitations for large-scale construction projects eligible for discretionary federal funding has forced the Baltimore-DC Building Trades out of the contracting process by not requiring contractors to turn to it to negotiate a PLA. Therefore, the Baltimore-DC Building Trades unquestionably has standing.

It is blackletter law that "a denial of a benefit in the bargaining process can itself create an Article III injury." *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998). In *Clinton v. City of New York*, the Supreme Court held that a farmers' cooperative had standing to challenge President Clinton's line-item veto cancellation of a tax benefit that Congress had established to assist farmers' cooperatives in acquiring processing facilities. The cooperative routinely used the tax benefit in obtaining more favorable purchase terms and was engaged in ongoing negotiations with a processing plant when the President canceled the tax benefit. The Court rejected the government's argument that any harm to the cooperative was too speculative, explaining that, "[b]y depriving [the cooperative] of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing." *Id.* at 432.

Last year, the U.S. District Court for the District of Columbia found that the Baltimore-DC Building Trades had standing in a lawsuit challenging federal agencies' noncompliance with

Executive Order 14063. There (as here), the Baltimore-DC Building Trades presented evidence showing that it negotiated PLAs on large-scale construction projects. Once the government stopped requiring PLAs on large-scale projects, the Baltimore-DC Building Trades' bargaining position was "tangibl[y] change[d]." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d at 303. Executive Order 14063 had granted the Baltimore-DC Building Trades a bargaining chip. By walking back the PLA requirement, the agencies "deprive[d] [the Baltimore-DC Building Trades] of the structured leverage the EO is designed to ensure." *Id.* Far from a generalized grievance, the Baltimore-DC Building Trades showed a "concrete interference with a recurring practice of negotiating PLAs in response to agency solicitations." *Id.* at 303-04. That injury was fairly traceable to the agencies' actions because contractors' decision *not* to negotiate PLAs was "a natural and probable consequence" of the elimination of the PLA requirement. *Id.* at 305. That injury was redressable because enjoining actions at odds with Executive Order 14063 would restore the Baltimore-DC Building Trades' bargaining position. *Id.* at 306.

*North America's Building Trades Unions v. Department of Defense* is consistent with Fourth Circuit standing caselaw. For example, in *Baltimore Gas & Electric Co. v. United States*, 133 F. Supp. 2d 721 (D. Md. 2001), *appeal dismissed on other grounds*, 290 F.3d 734 (4th Cir. 2002), a Maryland utility claimed that the Department of Defense acted illegally by issuing a solicitation that, in part, did not require the awardee to hold the service territory and franchise rights required under Maryland law. Other than the Maryland utility bringing the lawsuit, no other entity had these territory and franchise rights, meaning the Maryland utility "would enjoy a competitive advantage" in the solicitation. *Id.* at 726. By failing to require that the awardee hold Maryland territory and franchise rights, the solicitation denied the utility its competitive advantage, which is an injury in fact. *Id.* That injury was directly traceable to the wording of the solicitation

11

and would be redressed by an order directing the government to comply with the applicable law. *Id.* Therefore, the utility had standing. *Id.*

Here, Resolution 22-35 requires contractors bidding on certain MWAA projects to negotiate a PLA. Akerman Decl. ¶ 24. The Baltimore-DC Building Trades is signatory to a PLA for the multimillion-dollar Dulles Tier 2 Concourse-East Phase I project. *Id.* ¶ 6. MWAA had required Turner — which won the contract for that project — to negotiate that PLA. *Id.* ¶ 7. Under Resolution 22-35, the Baltimore-DC Building Trades anticipated having a similar bargaining chip in future negotiations with contractors seeking to work on large-scale MWAA construction projects. *Id.* ¶ 39. But MWAA has taken that bargaining chip away by issuing solicitations for large-scale contracts without PLA requirements. *Id.* ¶ 40. Contractors that win the solicitations for the North Airfield improvements project and the Dulles Tier 2 Concourse-East Phase II and III and Central Utility Plant project will *not* be required to negotiate PLAs. *Id.* ¶¶ 26, 38.

That harm to the Baltimore-DC Building Trades' bargaining position is actual, concrete, and particularized. But for MWAA's decision, the Baltimore-DC Building Trades would not have been injured. Granting a preliminary injunction will require MWAA to comply with Resolution 22-35 and include PLAs on the Dulles Tier 2 Concourse-East Phase II and III and Central Utility Plant project and the North Airfield improvements project, which will redress the Baltimore-DC Building Trades' injuries.

### B.    *MWAA's Lease Requires It to Comply with Procurement Policies Like Resolution 22-35.*

Section 6005(e) of the Enabling Act gives federal district courts "jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease" between MWAA and the federal government. 49 U.S.C. § 49104(c). "An action may be brought on behalf of the United States by the Attorney General, or by any aggrieved party." Pub. L. No. 99-500, 100

12

Stat. 1783, 1783-378.  This Court therefore has jurisdiction to enjoin MWAA's violation of its lease.[3]

That lease requires MWAA to "obtain, to the maximum extent practicable, full and open competition through the use of published competitive procedures" for contracts estimated to exceed $200,000; "adopt, maintain, and adhere to policies and procedures in the areas of procurement and contracting," which "should be substantially similar to those of similar public entities and should strive to reflect a standard of 'best practices'"; and comply with "generally accepted management principles," subject to audit by the Comptroller General.  Akerman Decl. ¶¶ 16-18.  In other words, MWAA's lease requires it to adopt and comply with procurement policies.  *See, e.g.*, *Wash.-Dulles Transp., Ltd.*, 263 F.3d at 376 (explaining that MWAA's lease requires it to "*use* published competitive procedures, not merely put them on paper").

MWAA's Board of Directors adopts procurement policies through resolutions.  MWAA, Contracting Manual § 5.3.2.1 (June 26, 2025).[4]  Those resolutions remain in effect and binding unless rescinded by a vote of the Board.  *See* MWAA, Bylaws art. VIII, § 2 (Nov. 19, 2025).[5] MWAA adopted Resolution 22-35 on November 16, 2022.  Akerman Decl. ¶ 19.  That resolution

---

[3]      As codified, Section 6005(e) provides that "[t]he Attorney General or an aggrieved party may bring an action *on behalf of the Government*" to enforce the lease.  49 U.S.C. § 49104(c) (emphasis added).  In *Washington-Dulles Transportation, Ltd. v. MWAA*, 263 F.3d 371 (4th Cir. 2001), the Fourth Circuit considered the disconnect between the enacted and codified text.  The court held that the original enactment controlled because the act codifying the Enabling Act "expressly disclaims the intent to make any substantive change in the law." *Id.* at 379.  Therefore, the enacted text of Section 6005(e) (expressly giving aggrieved parties the right to enforce the lease in court on their own behalf) controls here.

[4]      https://www.mwaa.com/sites/mwaa.com/files/2025-06/Contracting%20Manual-v5_3-06-2025_1.pdf

[5]      https://www.mwaa.com/sites/mwaa.com/files/Bylaws%202025.pdf

has not been rescinded and is still in effect. *Id.* ¶ 24. Therefore, MWAA is bound "to incorporate a PLA requirement, in accordance with the EO, for all large-scale construction projects, defined as a construction project for which the total estimated cost of the construction contract is $35 million or more for which the Airports Authority is eligible to receive discretionary Federal funding." *Id.* If MWAA fails to comply with Resolution 22-35, it would violate its lease with the federal government by disobeying published competitive procedures, which cannot be in accordance with best practices or generally accepted management principles.

### C. *MWAA Violated Its Lease by Failing to Comply with Resolution 22-35.*

MWAA violated Resolution 22-35 and, in turn, its lease by issuing solicitations for large-scale construction projects eligible for discretionary federal funding without PLA requirements. Specifically at issue here are the solicitations for the Dulles Tier 2 Concourse-East Phase II and III and Central Utility Plant project and the North Airfield improvements project. These are both projects for which MWAA is eligible to receive federal funding under the Airport Improvement Program. The Airport Improvement Program is a grant program administered by the FAA for providing funds for the planning and development of public-use airports. FAA, *Overview: What Is AIP & What Is Eligible?*[6] Airport planning, airport development projects, noise compatibility planning, and noise compatibility projects are all eligible for Airport Improvement Program funding. 49 U.S.C. § 48103(a). MWAA's own solicitation for the North Airfield improvements project shows that not only is that project likely eligible for Airport Improvement Program funding, but that MWAA anticipates *using* Airport Improvement Program funds for that project. Akerman Decl. ¶ 37. And the FAA has already awarded MWAA millions in Airport Improvement Program

---

[6]    https://www.faa.gov/airports/aip/overview (last visited Feb. 13, 2026).

14

funds for the Dulles Tier 2 Concourse-East project (including $89.8 million in 2025 alone), *id.* ¶ 33.

Moreover, Airport Improvement Program funding is *discretionary* federal funding. Neither the resolution nor the staff report defines "discretionary," so the Court is left to rely on the word's ordinary meaning. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018). Though MWAA can "define a word or phrase in a specialized way or employ a term of art with long-encrusted connotations in a given field," it did not do so here. *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025). The Baltimore-DC Building Trades is "entitled to rely on [the word's] ordinary meaning, not left to speculate about hidden messages." *Id.*

Funding is discretionary if its award is subject to an entity's choice or judgment. *See* Discretionary, *Black's Law Dictionary* (11th ed. 2019) ("involving an exercise of judgment and choice"); Discretionary, *Webster's Third New International Dictionary* (2002) ("left to discretion or individual judgment"). The FAA administers the Airport Improvement Program and has the authority to make project grants under the program to eligible projects. 49 U.S.C. § 47104(a). The FAA also has the authority to "decide when and in what amounts payments under the [project grant] agreement will be made." *Id.* § 47111(a). Therefore, the FAA has discretion in awarding funds under the Airport Improvement Program, meaning Resolution 22-35 applies to projects eligible for Airport Improvement Program grants.

Though the Court need not look further than the ordinary meaning of "discretionary," the Dulles Tier 2 Concourse-East project and North Airfield improvements project are also eligible for funding that is "discretionary" in the specialized Airport Improvement Program and federal spending contexts. First, the Airport Improvement Program includes both entitlement funds and a "discretionary fund" that the FAA can use for "making grants for any purpose . . . that the Secretary

15

considers most appropriate." 49 U.S.C. § 47115(b). The FAA's website confirms that "discretionary" refers to funds that are "available for use on eligible projects at the FAA's discretion after satisfying required apportionments." FAA, *AIP Glossary*.[7] Airport Improvement Program-funded projects by large hub, primary commercial service airports like the Ronald Reagan Washington National Airport and the Washington Dulles International Airport are eligible for discretionary funding. *See* FAA, *National Plan of Integrated Airport Systems (NPIAS) 2025-2029* app. A (Sept. 30, 2024) (classifying the Ronald Reagan Washington National Airport and the Washington Dulles International Airport as large hub, primary commercial service airports);[8] FAA, Order 5100.38D Change 1, *Airport Improvement Program Handbook* 4-8 (Feb. 26, 2019) (explaining that large hub, primary commercial service airports are eligible for discretionary funding).[9]

Second, in the context of federal spending, *discretionary* appropriations are "budgetary resources (except to fund direct-spending programs) provided in appropriation Acts." 2 U.S.C. § 900(c)(7). The direct-spending exception includes (a) "budget authority provided by law other than appropriation Acts"; (b) "entitlement authority"; and (c) "the Supplemental Nutrition Assistance Program." *Id.* § 900(c)(8). An "appropriation act" is a statute "that generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal*

---

[7]     https://www.faa.gov/airports/aip/aip_glossary (last visited Feb. 13, 2026).

[8]     https://www.faa.gov/sites/faa.gov/files/airports/planning_capacity/npias/current/ARP-NPIAS-2025-2029-Appendix-A.pdf

[9]     https://www.faa.gov/documentLibrary/media/Order/AIP-Handbook-Order-5100-38D-Chg1.pdf

*Budget Process* 13 (Sept. 2005).[10]  *See generally Ind. Mun. Power Agency v. United States*, 154 Fed. Cl. 752, 760 (2021) (looking to the Government Accountability Office's *Glossary* to determine if a statute is an appropriation act).

Though part of the Airport Improvement Program is funded using direct-spending funds set by 49 U.S.C. § 48103, Congress also provides supplemental, discretionary appropriations for the program through appropriation acts.  *E.g.*, Full-Year Continuing Appropriations & Extensions Act, 2025 § 11301(3), Pub. L. No. 119-4, 139 Stat. 9, 38 (providing $50 million in supplemental appropriations); Consolidated Appropriations Act, 2024 div. F, tit. I, Pub. L. No. 118-42, 138 Stat. 25, 311 (providing approximately $532 million in supplemental appropriations).  Beyond being discretionary in the federal budget sense, these supplemental appropriations are also discretionary in the sense that the FAA can decide how to award them.  *See* FAA, *Airport Improvement Program (AIP) 2025-2027 Supplemental Appropriation*.[11]

Therefore, both the Dulles Tier 2 Concourse-East project and the North Airfield improvements project are projects for which MWAA is eligible to receive discretionary federal funding.  They are also both worth well over $35 million.  *See* Akerman Decl. ¶¶ 33, 37.  They are covered by Resolution 22-35's PLA requirement, and MWAA is violating that resolution (and, by extension, its lease) by failing to require contractors to enter into PLAs covering project work.[12]

---

[10]   https://www.gao.gov/assets/gao-05-734sp.pdf

[11]   https://www.faa.gov/airports/aip/aip_supplemental_appropriation (last visited Feb. 13, 2026).

[12]   It does not matter whether MWAA is applying for funds the Airport Improvement Program or federal spending law classifies as "discretionary" or "entitlement."  Though, as explained above, the Court only needs to consider the ordinary meaning of "discretionary," Resolution 22-35

17

The only other issue is whether a PLA requirement for the projects at issue is "in accordance with the EO." Akerman Decl. ¶ 24. The first paragraph of Resolution 22-35's preamble defines "EO" as Executive Order 14063: "WHEREAS, Executive Order 14063, dated February 4, 2022, entitled 'Executive Order on Use of Project Labor Agreements for Federal Construction Projects' **_(EO)_** . . . ." *Id.* ¶ 32 (emphasis added). Similarly, the staff report refers to Executive Order 14063 as "EO." *See id.* And according to the resolution's preamble, Executive Order 14063 sets the federal government's PLA policy. *Id.* ¶ 31. Though the resolution's preamble also refers to Executive Order 14052, that order does not deal with, mention, or require PLAs. *See id.* ¶¶ 27-28, Ex. F, 86 Fed. Reg. 64,335 (Nov. 18, 2021). MWAA has not claimed that an exception to Executive Order 14063's PLA requirement might apply, *see id.* ¶ 26, so requiring a PLA on the Dulles Tier 2 Concourse-East project and the North Airfield improvements project is in accordance with Executive Order 14063. MWAA is violating its lease by refusing to comply with its still-binding procurement policy.

## II.    The Baltimore-DC Building Trades Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Without a preliminary injunction, the Baltimore-DC Building Trades will suffer irreparable harm. Harm is irreparable when it is actual and imminent and cannot wait until the end of litigation to be remedied. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019). Generally, harm is irreparable if money damages would be inadequate. *Multi-Channel TV*

---

couldn't be clearer that it applies whenever a project is *eligible* for discretionary federal funding — not just when MWAA *seeks* that funding. Indeed, MWAA rejected a draft version of the resolution that would have been limited to projects where MWAA seeks federal funding. *See* Akerman Decl. ¶¶ 23-24. Therefore, because the Dulles Tier 2 Concourse-East project and North Airfield improvements project are *eligible* for discretionary federal funding, Resolution 22-35 applies.

*Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994).

This Court should again look to the decision in *North America's Building Trades Unions v. Department of Defense*. There, the court found imminent harm to be unavoidable without an order enjoining enforcement of the unlawful agency actions. 783 F. Supp. 3d at 313. Executive Order 14063's PLA requirement "functioned as a bargaining lever," the removal of which "change[d] the entire negotiating landscape" and left the Baltimore-DC Building Trades without the power to as effectively persuade contractors to negotiate PLAs. *Id.* The court also cited to cases recognizing that interference with collective bargaining rights amounts to irreparable harm. *Id.*; *e.g.*, *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987). "The loss of bargaining power, particularly the mandated context within which such bargaining historically occurred under the EO, cannot be restored through damages or later litigation." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d at 313; *see also Salient CRGT, Inc. v. Sols. By Design II, LLC*, No. 20-cv-236, 2020 U.S. Dist. LEXIS 117170, at *19-20 (E.D. Va. Apr. 2, 2020) (finding that actions putting the plaintiff at a "competitive disadvantage" created irreparable harm).

It is also impossible to remedy harm to a party's contractual relationships and ability to do business. *See Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 239 (4th Cir. 2025). For example, in *Elev8 Baltimore, Inc. v. Corporation for National & Community Service*, No. 25-cv-1458, 2025 U.S. Dist. LEXIS 127611 (D. Md. July 7, 2025), nonprofits sued after the Trump Administration cancelled millions of dollars in grants and eliminated hundreds of AmeriCorps staff. The court found that the nonprofits were forced to divert resources from core activities and faced injuries to their working relationships and contracts with other organizations. *Id.* at *81-82. Those harms were irreparable. *Id.* at *84.

Here, the Baltimore-DC Building Trades is guaranteed to suffer irreparable harm, because

19

MWAA has deprived it of the opportunity to negotiate and administer PLAs — one of its core functions. *See* Akerman Decl. ¶ 4. The Baltimore-DC Building Trades is already party to a PLA negotiated under an MWAA PLA requirement (the PLA with Turner for the Dulles Tier 2 Concourse-East Phase I project). *Id.* ¶ 6. The Baltimore-DC Building Trades anticipated negotiating additional PLAs on large-scale MWAA projects, including Phases II and III of the Dulles Tier 2 Concourse-East project. *Id.* ¶ 25. But absent a preliminary injunction, the Baltimore-DC Building Trades will have no leverage, and likely no opportunity, to negotiate PLAs with contractors bidding on MWAA's projects. Indeed, without an injunction, the Baltimore-DC Building Trades will already have lost the ability to work on Phases II and III of the Dulles Tier 2 Concourse-East project. *Id.* ¶ 40. Without the bargaining chip guaranteed by Resolution 22-35, the Baltimore-DC Building Trades will lose the ability to form lasting contractual relationships with contractors, and its members will lose incalculable amounts of wages and benefits.

**III.   The Balance of Equities and Public Interest Weigh in Favor of a Preliminary Injunction.**

This Court should balance the effects of granting or withholding the injunction on each party and the public. *Winter*, 555 U.S. at 24. The equities and public interest weigh strongly in favor of a preliminary injunction because the substantial harm to the Baltimore-DC Building Trades of denying an injunction that would require MWAA to comply with Resolution 22-35 outweighs the minimal risk of delay MWAA might face if an injunction is granted.

As explained above, without a preliminary injunction, MWAA will continue to snub the Baltimore-DC Building Trades by refusing to require PLAs on large-scale construction projects, all in violation of Resolution 22-35. PLA requirements have given the Baltimore-DC Building Trades the bargaining leverage to negotiate PLAs on MWAA projects, as with the PLA negotiated with Turner on the Dulles Tier 2 Concourse-East Phase I project. Akerman Decl. ¶¶ 6-7. For over

20

two years, that PLA has guaranteed family-sustaining wages and benefits to members of the Baltimore-DC Building Trades' affiliates. *Id.* ¶¶ 6, 10. Without a PLA requirement, MWAA contractors are free to voluntarily choose whether to negotiate a PLA, meaning the Baltimore-DC Building Trades is left in the position it was in before MWAA adopted Resolution 22-35. *Id.* ¶ 40. Without a preliminary injunction, that harm will only grow more clearly irreparable, as MWAA closes the North Airfield improvements solicitation and selects winning contractors.

MWAA, on the other hand, has little to lose by complying with Resolution 22-35. To comply with a preliminary injunction, MWAA would only have to amend two solicitations to require PLAs. To the extent this causes any project delays, MWAA's own staff admitted that "PLAs can help avoid labor related disruptions on projects" and "secure the commitment of all stakeholders on a construction project that the project will proceed efficiently without interruption." Akerman Decl. ¶ 21. Requiring PLAs should *reduce* the risk of runaway project delays, not increase it.

Beyond reducing harm to the Baltimore-DC Building Trades, a preliminary injunction would serve the public interest by requiring MWAA to follow the law and by promoting sound procurement practices. The public "undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. U.S. Dep't of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020) (quoting *Roe v. Shanahan*, 359 F. Supp. 3d 382, 421 (E.D. Va. 2019)). MWAA is a public body accountable to the people of Virginia and the District of Columbia, as well as to the federal government through its lease. *Kerpen v. MWAA*, 907 F.3d 152, 162 (4th Cir. 2018). The public, therefore, has an interest in MWAA's compliance with the law, including those provisions of federal law that require it to "follow sound Government contracting principles," 49 U.S.C. § 49106(g), and solicit bids "through the use of published competitive procedures," *id.*

21

§ 49104(a)(4).

Article 11.D of MWAA's lease with the federal government requires it to "obtain, to the maximum extent practicable, full and open competition through the use of published competitive procedures" for contracts estimated to exceed $200,000. Akerman Decl. ¶ 16. And under Article 11.K, MWAA must "adopt, maintain, and adhere to policies and procedures in the areas of procurement and contracting," which "should be substantially similar to those of similar public entities and should strive to reflect a standard of 'best practices.'" *Id.* ¶ 17. An injunction would compel MWAA to comply with its published procurement policies, in accordance with its lease and with sound government contracting principles. Further, requiring PLAs on large-scale construction projects will promote economy and efficiency in procurement, just as governments and other project owners have been doing for decades. *E.g.*, *Boston Harbor*, 507 U.S. at 232-33. Therefore, the public interest and balance of equities weigh strongly in favor of a preliminary injunction.

22

## CONCLUSION

This Court should grant the Baltimore-DC Building Trades' motion for a preliminary injunction.

Respectfully submitted,

/s/ Lucas R. Aubrey
Lucas R. Aubrey
   Va. Bar No. 74641
Jacob J. Demree, PHV
*Attorneys for the Baltimore-D.C. Metro*
*Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com
demree@shermandunn.com

February 13, 2026

23

**CERTIFICATE OF SERVICE**

I certify that on February 13, 2026, this memorandum and all accompanying documents were filed using the Court's CM/ECF system.  A copy of this memorandum and all accompanying documents were served on MWAA's General Counsel by email (at ashley.carvalho@mwaa.com) and by U.S. mail at the following address:

Ashley Carvalho, Senior Vice President and General Counsel
Metropolitan Washington Airports Authority
1 Aviation Circle
Washington, D.C. 20001

/s/ Lucas R. Aubrey
Lucas R. Aubrey
   Va. Bar No. 74641
*Attorney for the Baltimore-D.C. Metro*
*Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com

February 13, 2026