**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **Baltimore-D.C. Metro Building and Construction Trades Council,** | |
| *Plaintiff,* | |
| v. | No. 1:26-cv-00296-PTG-WEF |
| **Metropolitan Washington Airports Authority,** | |
| *Defendant.* | |

**REPLY MEMORANDUM IN SUPPORT OF THE BALTIMORE-D.C. METRO
BUILDING AND CONSTRUCTION TRADES COUNCIL'S
MOTION FOR A PRELIMINARY INJUNCTION**

Lucas R. Aubrey
　　Va. Bar No. 74641
Jacob J. Demree, PHV
*Attorneys for the Baltimore-D.C. Metro
Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com
demree@shermandunn.com

March 12, 2026

## TABLE OF CONTENTS

Table of Authorities...................................................................................................................iii

Introduction...................................................................................................................... 1

Argument .......................................................................................................................... 1

      I.     The Baltimore-DC Building Trades Is Likely to Succeed on the Merits................ 1

           A.     The Baltimore-DC Building Trades Has Standing. .................................... 1

           B.     MWAA's Lease Requires It to Comply with Procurement
                Policies Like Resolution 22-35. ...................................................................... 3

           C.     MWAA Violated Its Lease by Failing to Comply with
                Resolution 22-35. .......................................................................................... 4

      II.    The Baltimore-DC Building Trades Will Suffer Irreparable Harm Absent a
          Preliminary Injunction. ........................................................................................... 8

      III.   The Balance of Equities and Public Interest Weigh in Favor of a
          Preliminary Injunction. ...........................................................................................11

Conclusion ...................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**                                                                                                                 **Page(s)**

*Am. Angus Ass'n v. Sysco Corp.*,
 829 F. Supp. 807 (W.D.N.C. 1992) ...............................................................................7

*Candle Factory, Inc. v. Trades Assocs. Grp.*,
 23 F. App'x 134 (4th Cir. 2001) (per curiam) ..................................................................10

*Deklewa*,
 282 N.L.R.B. 1375 (1987), *enforced sub nom. Int'l Ass'n of Bridge, Structural &*
 *Ornamental Iron Workers, Loc. 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988) ........................12

*Dist. of Columbia v. Heller*,
 554 U.S. 570 (2008).........................................................................................................5

*Fulton v. City of Philadelphia*,
 593 U.S. 522 (2021).........................................................................................................5

*Gordon v. Holder*,
 632 F.3d 722 (D.C. Cir. 2011) ......................................................................................10

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
 783 F. Supp. 3d 290 (D.D.C. 2025) ............................................................................ 8-10

*Nat. Res. Def. Council v. NRC*,
 666 F.2d 595 (D.C. Cir. 1981) ..................................................................................... 2-3

*NetChoice v. Jones*,
 No. 25-cv-2067, 2026 U.S. Dist. LEXIS 41312 (E.D. Va. Feb. 27, 2026) ................. 10-11

*NRC v. Texas*,
 605 U.S. 665 (2025).........................................................................................................2

*Percipient.ai, Inc. v. United States*,
 153 F.4th 1226 (Fed. Cir. 2025) (en banc), *cert. denied*, 223 L. Ed. 2d (2026)..................2

*Salient CRGT, Inc. v. Sols. By Design II, LLC*,
 No. 20-cv-236, 2020 U.S. Dist. LEXIS 117170 (E.D. Va. Apr. 2, 2020) ..........................9

*SourceAmerica v. U.S. Dep't of Educ.*,
 368 F. Supp. 3d 974 (E.D. Va. 2019), *vacated in part sub nom. Kansas v.*
 *SourceAmerica*, 826 F. App'x 272 (4th Cir. 2020) (per curiam)........................................2

*Stone v. INS,*
     514 U.S. 386 (1995)............................................................................................5

*Wash.-Dulles Transp., Ltd. v. MWAA,*
     263 F.3d 371 (4th Cir. 2001) ............................................................................4

*Winter v. Nat. Res. Def. Council, Inc.,*
     555 U.S. 7 (2008)............................................................................................9

**Statutes**

49 U.S.C. § 49104(c) ....................................................................................................3

Infrastructure Investment & Jobs Act div. J, tit. VIII,
     Pub. L. No. 117-58, 135 Stat. 429, 1418-19 ....................................................7

Pub. L. No. 99-500, 100 Stat. 1783, 1783-378 ............................................................3

**Other Authorities**

FAA, *FY 2026 Notice of Funding Opportunity: Airport Terminal Program (ATP)* (Dec.
     8, 2025), https://www.faa.gov/newsroom/FY26-ATP-NOFO-8DEC2025 ........................7

WMATA, *Office of Procurement and Materials (PRMT) Best Practices Manual (BPM)*
     (Sept. 4, 2024), https://www.wmata.com/business/procurement/upload/Best-
     Practices-Manual.pdf ......................................................................................2

**INTRODUCTION**

As explained in response to the Metropolitan Washington Airports Authority's ("MWAA") motion to dismiss, most of the issues in this case are undisputed. For the reasons explained below, the Baltimore-D.C. Metro Building and Construction Trades Council ("Baltimore-DC Building Trades") is likely to succeed on the merits of its challenge. Moreover, the Baltimore-DC Building Trades is imminently likely to suffer irreparable harm without a preliminary injunction. Once construction starts on the Tier 2 Center project, the Baltimore-DC Building Trades will have lost its ability to bargain over wages, hours, and other terms and conditions of work. The Court cannot turn back the clock and retroactively allow bargaining over work once that work has already been performed. Relatedly, MWAA's arguments that the balance of equities and public interest weigh against a preliminary injunction are unconvincing. The Court should require MWAA to comply with Resolution 22-35 while this case is pending.[1]

**ARGUMENT**

**I.     The Baltimore-DC Building Trades Is Likely to Succeed on the Merits.[2]**

**A.     *The Baltimore-DC Building Trades Has Standing.***

To start, the Baltimore-DC Building Trades has both Article III standing (which MWAA

---

[1] Based on its communications with MWAA's General Counsel, the Baltimore-DC Building Trades referred to a "Dulles Tier 2 Concourse-East Phase II and III and Central Utility Plant project" in its complaint and preliminary injunction motion. That project is the same as the "Tier 2 Center" project referred to in MWAA's motion to dismiss and response to the preliminary injunction motion. Similarly, the "Dulles Tier 2 Concourse-East Phase I project" is the same as the "Tier 2 East" project. For simplicity, this filing uses "Tier 2 Center" and "Tier 2 East."

[2] The Baltimore-DC Building Trades concedes that its arguments relating to the North Airfield improvements project are now moot because, in response to this lawsuit, MWAA has voluntarily amended the solicitation to extend the date proposals are due and to add a project labor

does not dispute) and statutory standing.  MWAA argues that the Baltimore-DC Building Trades is not an "aggrieved party" within the meaning of the Enabling Act and has waived its claim, because it never filed a timely bid protest of the Tier 2 Center solicitation.  But the Baltimore-DC Building Trades had no right to file a bid protest, because it did not have a legitimate "interest" in the procurement.  In the procurement context, the word "interest" has a highly specialized meaning that applies only to actual or prospective bidders or offerors.  *See* Balt.-DC Bldg. Trades MTD Memo. 3-5; *e.g.*, *Percipient.ai, Inc. v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025) (en banc), *cert. denied*, 223 L. Ed. 2d 509 (2026); WMATA, *Office of Procurement and Materials (PRMT) Best Practices Manual (BPM)* § 17-1(e) (Sept. 4, 2024).[3]  Forcing the Baltimore-DC Building Trades — a non-bidder — to file a bid protest would be futile, so it is an "aggrieved party" and has not waived its claim, and this Court is the proper forum for the Baltimore-DC Building Trades' challenge.  *See* Balt.-DC Bldg. Trades MTD Memo. 5; *see also SourceAmerica v. U.S. Dep't of Educ.*, 368 F. Supp. 3d 974, 990-91 (E.D. Va. 2019), *vacated in part on other grounds sub nom. Kansas v. SourceAmerica*, 826 F. App'x 272 (4th Cir. 2020) (per curiam) (allowing judicial review where party could not have filed a bid protest).

Though courts have interpreted the phrase "party aggrieved" to require plaintiffs to have been a party in an agency action, *e.g.*, *NRC v. Texas*, 605 U.S. 665, 675-76 (2025), locking the Baltimore-DC Building Trades out of court because it "was not a party to proceedings in which, by definition, it could not join would be to exalt literalism over common sense," *Nat. Res. Def.*

---

agreement requirement to the solicitation..  However, its arguments relating to the Tier 2 Center solicitation are still alive.  In fact, a solicitation for that project provided by MWAA to counsel for the Baltimore-DC Building Trades confirms that the project is worth up to $1.6 billion.  Decl. of Jacob J. Demree Ex. A at 14 [hereinafter Demree Decl.].

[3]    https://www.wmata.com/business/procurement/upload/Best-Practices-Manual.pdf

*Council v. NRC*, 666 F.2d 595, 601 n.42 (D.C. Cir. 1981); *see* Balt.-DC Bldg. Trades MTD Memo. 5-6. And as discussed below, the Baltimore-DC Building Trades and MWAA communicated about MWAA's compliance with its lease for months before the Baltimore-DC Building Trades filed suit, yet MWAA refused to change course. Therefore, the Baltimore-DC Building Trades provided ample notice and opportunity to cure MWAA's violation of its lease.[4] *See* Balt.-DC Bldg. Trades MTD Memo. 6-7.

> **B.      *MWAA's Lease Requires It to Comply with Procurement Policies Like Resolution 22-35.***

MWAA does not dispute that Section 6005(e) of the Enabling Act gives federal district courts "jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease" between MWAA and the federal government, 49 U.S.C. § 49104(c), and that "[a]n action may be brought on behalf of the United States by the Attorney General, or by any aggrieved party," Pub. L. No. 99-500, 100 Stat. 1783, 1783-378. Instead, MWAA argues that Resolution 22-35 is not a "published competitive procedure" under its lease. However, courts across the country have found that project labor agreements ("PLAs") can promote the purposes underlying competitive bidding laws, and the Court of Federal Claims has not interpreted federal competitive bidding law to per se prohibit PLA requirements. *See* Balt.-DC Bldg. Trades MTD Memo. 8-9 (collecting cases). Moreover, MWAA's Contracting Manual describes resolutions like Resolution 22-35 as published policies that Contracting Officers must comply with. *See id.* at 9-10; MWAA MTD Memo. Ex. 4 at 55.

MWAA also ignores two other requirements in the lease, which require it to (1) "adopt,

---

[4]      The Baltimore-DC Building Trades addresses MWAA's statutory standing arguments more fully in its opposition to MWAA's motion to dismiss and incorporates those arguments here. *See* Balt.-DC Bldg. Trades MTD Memo. 3-7.

3

maintain, and adhere to policies and procedures in the areas of procurement and contracting," which "should be substantially similar to those of similar public entities and should strive to reflect a standard of 'best practices'"; and (2) comply with "generally accepted management principles," subject to audit by the Comptroller General. Decl. of Greg Akerman ¶¶ 17-18 [hereinafter Akerman Decl.]. Like the "published competitive procedures" requirement, those two requirements are independently binding. The Fourth Circuit has made clear that Section 6005(e) of the Enabling Act gives federal courts the authority to enforce *any* term of the lease. *See Wash.- Dulles Transp., Ltd. v. MWAA*, 263 F.3d 371, 376 (4th Cir. 2001); Balt.-DC Bldg. Trades MTD Memo. 10-12.

MWAA also mischaracterizes the interests served by Resolution 22-35's PLA requirement by claiming that the requirement merely grants an advantage to a union and does not implicate a federal concern in the Enabling Act or lease. But courts have long held that PLA requirements serve important interests, like public entities' need for predictable costs, a steady supply of skilled labor, and avoidance of labor disputes. *See* Balt.-DC Bldg. Trades MTD Memo. 13 (collecting cases). The staff report and the Strategic Development Committee identified similar interests as weighing in favor of a PLA requirement, and the PLA on the Tier 2 East project expressly served similar purposes. *See id.* at 12-14.

### C.      *MWAA Violated Its Lease by Failing to Comply with Resolution 22-35.*

MWAA does not dispute much of the Baltimore-DC Building Trades' interpretation of Resolution 22-35. The sole issue is whether MWAA "is eligible" to receive discretionary federal funding for the Tier 2 Center project. Contracting Officers have zero discretion in deciding whether to follow Board resolutions, since the lease and Enabling Act require compliance with binding procurement policies like Resolution 22-35. *See* Balt.-DC Bldg. Trades MTD Memo. 14-15. And contrary to MWAA's argument that Resolution 22-35 applies only when MWAA is

4

*seeking* a federal grant that requires a PLA, the plain text and history of Resolution 22-35 show that the resolution applies whenever a project could be a *proper recipient* of federal funding. *See id.* at 15-19.

Several key principles of statutory interpretation apply. First, this Court should presume that MWAA intends amendments to its resolutions to "have real and substantial effect," otherwise there would be no reason for the change. *Stone v. INS*, 514 U.S. 386, 397 (1995). The first draft of Resolution 22-35 would have applied only if MWAA were *seeking* federal funding. Akerman Decl. ¶ 23. But MWAA changed the resolution before adopting it so that it would apply whenever a project is *eligible* for federal funding. *Id.* ¶ 24. It cannot be true that "eligible" and "seeking" have the same meaning. Though the affidavit submitted with MWAA's motion states that "[t]o be eligible for discretionary funding, the Airports Authority must specifically apply for any discretionary grant under AIP," Aff. of Brook Belete ¶ 7 [hereinafter Belete Aff.], that interpretation would render MWAA's decision to amend the resolution before adopting it meaningless.

Second, this Court should not rely on Resolution 22-35's preamble to "limit or expand the scope" of its operative clause. *Dist. of Columbia v. Heller*, 554 U.S. 570, 578 (2008). Resolution 22-35's preamble may focus on securing federal funding, but the history of the resolution and the plain text of its operative clause show that the resolution was not intended to be limited to projects where MWAA was seeking — let alone where MWAA was awarded — federal funds.

Finally, Resolution 22-35's title ("Implementing a Project Labor Agreement Requirement for Certain Federally Funded Construction Projects") may not override the resolution's plain words. *Fulton v. City of Philadelphia*, 593 U.S. 522, 536-37 (2021). It's not permissible to interpret the title's use of the word "certain" as referring to only *some* construction projects that

5

are estimated to cost $35 million or more and for which MWAA is eligible to receive discretionary federal funding (e.g., projects **actually** funded with federal grants).  That would wrongly narrow the scope of Resolution 22-35's plain words.

MWAA attached minutes of a Strategic Development Committee meeting in support of its narrow interpretation of Resolution 22-35's eligibility requirement.  But those minutes show that the Board was concerned not just about federal funding, but about delays, conflicts between contractors, use of a highly trained and reliable workforce, and opportunities for underrepresented groups.  MWAA MTD Memo. Ex. 2 at 3-4, 10.  In fact, Resolution 22-35 was passed after several members of Congress urged MWAA to adopt a broad PLA resolution.  Supplemental Decl. of Greg Akerman ¶ 4 [hereinafter Akerman Supp. Decl.].  Representatives Jennifer Wexton and Gerald Connolly, Delegate Eleanor Holmes Norton, and Senators Tim Kaine and Mark Warner sent a letter to MWAA on October 14, 2022, that in part encouraged the Board to pass a resolution requiring PLAs on *all* future projects over $35 million — not just projects for which MWAA was seeking federal funding.  *Id.*  Any argument that Resolution 22-35 was intended to apply only to a narrow subset of large-scale projects is contrary to its clear text and history.

Here, the Tier 2 Center project is eligible for discretionary Airport Improvement Program funding as a project at a large hub, primary commercial service airport.  *See* Balt.-DC Bldg. Trades PI Memo. 16.  And Congress has provided supplemental, discretionary appropriations for the Airport Improvement Program for which MWAA could apply.  *See id.* at 17.  There are restrictions on what types of projects discretionary Airport Improvement Program funding may be used for, *see* Balt.-DC Bldg. Trades MTD Memo. 18, but here, as a project that would be a proper recipient of discretionary federal funding, the Tier 2 Center project is *eligible* for discretionary federal funding, and a PLA should have been required.

In its briefing, MWAA refers to funding through the Airport *Terminal* Program.  In its memorandum in support of its preliminary injunction motion, the Baltimore-DC Building Trades focused on Airport Improvement Program funding because the solicitation for the North Airfield improvements project expressly stated that MWAA "anticipates utilizing Federal Aviation Administration (FAA) Airport Improvement Program funds for this Work."  Akerman Decl. Ex. I at 20.  However, the FAA's Airport Terminal Program *also* provides discretionary funds for terminal development projects (like part of the Tier 2 Center project) to entities eligible for funds under the Airport Improvement Program.  *See* Infrastructure Investment & Jobs Act div. J, tit. VIII, Pub. L. No. 117-58, 135 Stat. 429, 1418-19; FAA, *FY 2026 Notice of Funding Opportunity: Airport Terminal Program (ATP)* (Dec. 8, 2025).[5]  Whether under the Airport Improvement Program or the Airport Terminal Program, the Tier 2 Center project is eligible for discretionary federal funds. It does not matter that the Tier 2 Center project "is funded without any federal grant money," Belete Aff. ¶ 6 — Resolution 22-35 couldn't be clearer that it applies whenever a project is *eligible* for discretionary federal funding, and not just when MWAA *seeks* that funding.[6]

---

[5]       https://www.faa.gov/newsroom/FY26-ATP-NOFO-8DEC2025

[6]       MWAA casts doubt on the sufficiency of the declaration that the Baltimore-DC Building Trades submitted in support of its preliminary injunction motion.  *See* MWAA PI Memo. 6 n.5. But MWAA's claim that the declaration "seems to be poor support for the 'extraordinary remedy' of a preliminary injunction," *id.*, forgets that the "urgent nature of preliminary injunction proceedings" allows courts to consider even hearsay evidence submitted by the parties, *Am. Angus Ass'n v. Sysco Corp.*, 829 F. Supp. 807, 816 (W.D.N.C. 1992).  MWAA also questions the declarant's personal knowledge of the documents referenced in paragraphs 15, 19, 20, and 23 (the lease, Resolution 22-35, the staff report, and a draft of the staff report), but each of the documents referenced in paragraphs 15, 19, 20, and 23 are public records available on MWAA's website, https://www.mwaa.com/.

**II.    The Baltimore-DC Building Trades Will Suffer Irreparable Harm Absent a Preliminary Injunction.**

MWAA argues that the Baltimore-DC Building Trades' claim that it would lose work is speculative.  MWAA PI Memo. 6.  But that narrowly states the harm and overlooks the impact of refusing to comply with Resolution 22-35.  As explained in the Baltimore-DC Building Trades' memorandum in support of its preliminary injunction motion, "MWAA has deprived it of the opportunity to negotiate and administer PLAs" on large-scale projects.  Balt.-DC Bldg. Trades PI Memo. 20.  The Tier 2 Center project was bid without a PLA requirement, "forcing the Baltimore-DC Building Trades to rely on contractors' wholly voluntary decision about whether a PLA makes business sense."  Akerman Decl. ¶ 40.

This Court should look to the decision in *North America's Building Trades Unions v. Department of Defense*, 783 F. Supp. 3d 290 (D.D.C. 2025).  There, as here, the Baltimore-DC Building Trades experienced "concrete disruptions in PLA negotiations."  *Id.* at 313.  The defendants' argument that the harm was too speculative "overlook[ed] the fact that the PLA mandate functioned as a bargaining lever.  ***Its removal change[d] the entire negotiating landscape, leaving NABTU and its affiliates [like the Baltimore-DC Building Trades] in a substantially weakened position that undermine[d] their statutory and contractual role in large-scale federal construction projects.***"  *Id.* (emphasis added).

Here, the Baltimore-DC Building Trades successfully negotiated a PLA with Turner Construction Company ("Turner") for the Tier 2 East project.  Akerman Decl. ¶ 6.  Turner also won the Tier 2 Center project, *see* Demree Decl. Ex. B, but did not negotiate a PLA with the Baltimore-DC Building Trades.  Resolution 22-35's PLA requirement "functioned as a bargaining lever," and MWAA's refusal to comply with that requirement leaves the Baltimore-DC Building Trades "in a substantially weakened position."  *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783

8

F. Supp. 3d at 313. That harm is imminent — not just "possible" or even "likely" — so the Baltimore-DC Building Trades has established irreparable harm. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

MWAA claims that there would be an easy fix for the Baltimore-DC Building Trades' injury: just modify the Tier 2 Center contract if the Baltimore-DC Building Trades wins on the merits. MWAA PI Memo. 7-8. But "once a contract is awarded without the application of a PLA, neither the opportunity to negotiate *nor the benefits conferred by such agreements* can be retroactively imposed." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d at 313 (emphasis added). "The loss of bargaining power . . . cannot be restored through damages or later litigation." *Id.*; *see also Salient CRGT, Inc. v. Sols. By Design II, LLC*, No. 20-cv-236, 2020 U.S. Dist. LEXIS 117170, at *19-20 (E.D. Va. Apr. 2, 2020). Now that the contract has been awarded, the Baltimore-DC Building Trades will lose the opportunity to negotiate over wages, benefits, and working conditions for any employees who may begin work on the project before an injunction issues. Indeed, the price schedule for the Tier 2 Center contract already includes wage rates for laborers, a carpenter, and other employees that were not negotiated by the Baltimore-DC Building Trades. *See* Demree Decl. Ex. C at 145. The Tier 2 Center contract also sets holidays that were not negotiated by the Baltimore-DC Building Trades. *See id.* at 40. As time goes on and work on the project moves forward, the harm to the Baltimore-DC Building Trades' bargaining power will increase, as more employees perform work under terms not set by a Baltimore-DC Building Trades PLA.

MWAA argues that any harm here is self-inflicted because the Baltimore-DC Building Trades (1) failed "to timely protest the solicitation," and (2) failed to attempt to negotiate a PLA on the Tier 2 Center project. MWAA PI Memo. 7 & n.6. To start, as explained above, the

9

Baltimore-DC Building Trades had no opportunity to protest the solicitation because it was not an actual or potential bidder or offeror.  Nor did the Baltimore-DC Building Trades inflict its own impaired bargaining position.  *MWAA* refused to require a PLA on the Tier 2 Center solicitation, and Turner (the winning contractor) did not negotiate a PLA with the Baltimore-DC Building Trades, even after the Baltimore-DC Building Trades approached it to discuss the Tier 2 Center project.  Akerman Supp. Decl. ¶ 11.  Given that Turner had previously negotiated a PLA on the Tier 2 East project, the only possible reason for Turner's refusal to negotiate a PLA this time is MWAA's decision not to comply with Resolution 22-35.  *See, e.g.*, *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d at 312-13 (rejecting defendants' irreparable harm argument that the Baltimore-DC Building Trades was not barred from negotiating PLAs with contractors).

MWAA argues in its memorandum in support of its motion to dismiss that the Baltimore-DC Building Trades' "delay in bringing suit should be considered in weighing the request for a preliminary injunction."  MWAA MTD Memo. 15.  Of course, that has nothing to do with the merits of MWAA's motion to dismiss.  But neither is a delay in filing alone an appropriate basis for denying a preliminary injunction.  *See Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011); *see also Candle Factory, Inc. v. Trade Assocs. Grp.*, 23 F. App'x 134, 139 (4th Cir. 2001) (per curiam) (holding that delay "does not as a matter of law preclude a finding by the court of irreparable harm").  In *Candle Factory, Inc.*, a plaintiff waited one year before moving for preliminary injunctive relief.  Though delay in seeking a preliminary injunction, "coupled with prejudicial impact from the delay," should be considered, delay itself is not a reason to deny a preliminary injunction.  23 F. App'x at 138.  Finding that the plaintiff "partially explained" the reasons for its delay, the Fourth Circuit held that the district court did not abuse its discretion in granting the preliminary injunction.  *Id.* at 138-39; *see also NetChoice v. Jones*, No. 25-cv-2067,

10

2026 U.S. Dist. LEXIS 41312, at *36-37 (E.D. Va. Feb. 27, 2026) (finding that a plaintiff's delay in filing did not diminish the threat of irreparable harm or prejudice the defendant, because the challenged law had not yet gone into effect).

Here, the Baltimore-DC Building Trades filed its preliminary injunction motion after several rounds of communications with MWAA over its violation of the lease. After learning about the Tier 2 Center project in early September 2025, the Baltimore-DC Building Trades promptly notified several MWAA Board members and the Northern Virginia congressional delegation. Akerman Supp. Decl. ¶¶ 6-8. Baltimore-DC Building Trades President Akerman was in frequent communication with members of MWAA's Board about the Tier 2 Center project even before MWAA's notification in late October 2025 that it "did not include the requirement of a PLA in the solicitation" for the Tier 2 Center project. Akerman Decl. ¶ 26; *see* Akerman Supp. Decl. ¶¶ 9-10. Instead of immediately filing a lawsuit, the Baltimore-DC Building Trades attempted to resolve its dispute informally. Akerman Supp. Decl. ¶ 13. Plus, MWAA admits that the Tier 2 Center's "groundbreaking has not yet occurred," so any delay in filing has not reduced the Baltimore-DC Building Trades' irreparable harm or prejudiced MWAA's ability to complete the project. MWAA MTD Memo. 10 n.8.[7]

### III. The Balance of Equities and Public Interest Weigh in Favor of a Preliminary Injunction.

In arguing that the balance of the equities weighs in its favor, MWAA claims that "[i]t is

---

[7]     MWAA states that the Baltimore-DC Building Trades "argues that if the preliminary injunction is not granted . . . the Airports Authority will never again include a PLA requirement in its solicitations." MWAA PI Memo. 8; *see also id.* at 9 (describing that argument as a "sky-is-falling" argument). That grossly misrepresents the Baltimore-DC Building Trades' claim, which is merely that MWAA has violated its lease by refusing to require PLAs on large-scale construction projects eligible to receive discretionary federal funding. Compl. ¶¶ 70-71.

hard to imagine how Turner could pay substantially different pay rates to skilled employees working on physically proximate projects such as Tier 2 East and Tier 2 Center." MWAA PI Memo. 9 n.7. But the fact remains that employees working on the Tier 2 Center project will not be working under a PLA negotiated with the Baltimore-DC Building Trades. They will not have access to a grievance procedure, *see* Akerman Decl. Ex. A at 7-8, fair referral procedures, *see id.* at 10, jointly-negotiated work schedules, *see id.* at 11-12, a process for resolving craft jurisdictional disputes, *see id.* at 8-9, or negotiated wages and fringe benefits, *see id.* at 11. And the Baltimore-DC Building Trades, even if it were able to start negotiations with Turner, would not be bargaining in the same position as it would have been under a PLA requirement. If Turner decides that negotiations are going nowhere, it can walk away, without consequences. *See Deklewa*, 282 N.L.R.B. 1375, 1385 (1987), *enforced sub nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Loc. 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988) (explaining that employers are bound by a prehire collective bargaining agreement only during that agreement's term).

On the other hand, MWAA's claim that a preliminary injunction would force it to modify the Tier 2 Center contract "and delay work ongoing under same" is only partly true. MWAA PI Memo. 9. The Tier 2 Center's "groundbreaking has not yet occurred," so a preliminary injunction would not force a stop in construction. MWAA MTD Memo. 10 n.8. Moreover, MWAA exaggerates the costs of modifying the contract, since it "should not be a heavy lift" for Turner to negotiate a PLA for the Tier 2 Center project, given that Turner already negotiated a PLA with the Baltimore-DC Building Trades on the Tier 2 East project. MWAA PI Memo. 7-8.

Therefore, the balance of the equities supports a preliminary injunction. To avoid the impending permanent loss of bargaining power, and to protect the public interests identified in the Baltimore-DC Building Trades' memorandum in support of its preliminary injunction motion, the

Court should require MWAA to comply with Resolution 22-35 during the pendency of this case.

## CONCLUSION

This Court should grant the Baltimore-DC Building Trades' motion for a preliminary injunction.

Respectfully submitted,

/s/ Lucas R. Aubrey
Lucas R. Aubrey
    Va. Bar No. 74641
Jacob J. Demree, PHV
*Attorneys for the Baltimore-D.C. Metro*
*Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com
demree@shermandunn.com

March 12, 2026

**CERTIFICATE OF SERVICE**

I certify that on March 12, 2026, this memorandum and all accompanying documents were

filed using the Court's CM/ECF system.  All attorney participants in the case are registered

CM/ECF users and will be served electronically via that system.

<u>/s/ Lucas R. Aubrey</u>
Lucas R. Aubrey
    Va. Bar No. 74641
*Attorney for the Baltimore-D.C. Metro*
*Building and Construction Trades Council*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com


March 12, 2026